# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4810 | **DATE** | 4/10/2003 |
| **CASE TITLE** | Elizabeth Cunningham vs. Equicredit Corporation of Illinois | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 5/9/2003 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on motion to dismiss plaintiff's second amended complaint. Defendant Equicredit's motion to dismiss plaintiffs' second amended complaint is granted with prejudice as to count XIII and denied as to all other counts directed at defendant Equicredit (Counts III, IV, V, VIII, X, XI, XII).**

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

3
number of notices

APR 1 1 2003
date docketed

4/10/2003
date mailed notice

SM
courtroom deputy's initials

U.S. DISTRICT COURT
CLERK

Date/time received in central Clerk's Office

docketing deputy initials

SM
mailing deputy initials

Document Number

38

|  |  |  |
|---|---|---|
| ELIZABETH CUNNINGHAM AND | ) | |
| ESTATE OF LOUISE CUNNINGHAM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 02 C 4810 |
| | ) | |
| EQUICREDIT CORPORATION OF | ) | Magistrate Judge Ian H. Levin |
| ILLINOIS, THE LOAN CENTER, INC. | ) | |
| AND MARVIN HUNTER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Elizabeth Cunningham and the estate of Louise Cunningham (hereinafter "Plaintiffs") bring a thirteen-count Second Amended Complaint alleging Truth in Lending Act and state law claim violations against Defendants EquiCredit Corporation of Illinois, The Loan Center, Inc. and Marvin Hunter for wrongful and predatory lending practices.

Defendant EquiCredit Corporation of Illinois (hereinafter "EquiCredit") moves the Court to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion is granted as to Count XIII and denied as to all other counts.

## BACKGROUND FACTS

In 1984, Plaintiff Elizabeth Cunningham (hereinafter "Elizabeth") bought a home located at 2315 South Central Park in Chicago, Illinois. (2nd. Am. Compl. ¶ 6.) Elizabeth is disabled, and since 1995, her income has been limited to Social Security disability benefits and sporadic rental

payments. (*Id.* at ¶ 6.) Plaintiff Louise Cunningham (hereinafter "Louise") was Elizabeth's mother and lived with Elizabeth from 1984 though October of 1999, when Louise passed away at the age of 85. (*Id.* at ¶ 7.) During that time period, Louise was not employed and her only income came from Supplemental Security Income payments. (*Id.* at ¶ 7.)

In early 1999, Plaintiffs' home was in a state of disrepair. (2nd. Am. Compl. ¶ 21.) Elizabeth met with Defendant Marvin Hunter ("Hunter"), a home improvement contractor, to discuss the condition of the home. (*Id.* at ¶ 21.) Hunter told Elizabeth that he could arrange to make the necessary home repairs and he referred Elizabeth to Defendant The Loan Center (hereinafter "The Loan Center), a mortgage broker, to obtain financing for the repairs. (*Id.* at ¶ 22.)

Elizabeth contacted The Loan Center and spoke with Derwin Moore (hereinafter "Moore"), an employee and loan representative (i.e., broker) of The Loan Center regarding the needed home repairs and her financial situation. (2nd. Am. Compl. ¶¶ 23-24.) Moore promised Elizabeth that she could get a new loan that would pay off her existing mortgage, provide her with extra cash and furnish the funds to make the needed repairs and improvements. (*Id.* ¶ 25.) Based on the telephone conversation, Elizabeth agreed to meet with Moore to discuss the loan. (*Id.* at ¶ 26.)

At the meeting, Moore reiterated The Loan Center's promise that it could locate funding that would provide Plaintiffs with a loan that would pay off the existing mortgage, provide her with $10,000.00 in extra cash, and furnish the funds needed to make the needed home repairs. (2nd. Am. Compl. ¶ 34.) Elizabeth and Moore discussed the loan and agreed that the home repairs should be financed by refinancing the existing mortgage through a new loan in the amount of $95,200.00 payable over a thirty year term. (*Id.* at ¶¶ 25, 28; Ex. A.)

In order to find an appropriate lender, Moore requested that Elizabeth fill out a Uniform

Residential Loan Application (hereinafter "loan application"). (2nd. Am. Compl. ¶ 29; Ex. B.) Moore told Elizabeth that she had to show that she had a job in order to qualify for the loan. (*Id.* ¶ 30.) Plaintiffs allege that in section IV entitled Employment Information of the loan application, Moore instructed Elizabeth to falsely indicate that for the past two years she was employed by M & M Cleaning located in Broadview, Illinois. (*Id.* ¶ 30; Ex. B.) Moreover, in section V of the loan application, Moore instructed Elizabeth to note falsely that she received $1,800.00 per month from her M & M Cleaning job. (*Id.* ¶ 31; Ex. B.) In addition, Elizabeth noted that she received $678.00 per month in disability income and $675.00 per month from renting a first floor apartment; her mother, Louise, received $500.00 per month in Supplemental Security Income benefits; and their combined monthly income was $3,653.00. (*Id.*)

Plaintiffs further allege that Moore also instructed Elizabeth to show that she and her mother, Louise, had graduated from high school, despite the fact that this was not true. (2nd. Am. Compl. ¶ 32.) Rather, Elizabeth attended school into the tenth grade and her mother attended school into the fourth grade and never learned to read or write very well. (*Id.*)

The loan application also indicated that Plaintiffs had been referred to The Loan Center by Hunter. (2nd. Am. Compl. ¶ 33.)

Based on the meeting and representations made by Moore, Elizabeth agreed to proceed with the refinancing of her existing mortgage with The Loan Center. (2nd. Am. Compl. ¶ 35.) Plaintiffs entered into a written agreement entitled Loan Brokerage Disclosure Statement, Loan Brokerage Agreement, and Borrower Information Document (hereinafter "Loan Brokerage Agreement") with The Loan Center for a $95,200.00 loan on February 23, 1999. (*Id.* ¶ 27; Ex. A.) Elizabeth signed the appropriate forms for both herself and her mother, Louise, knowing that both the employment

3

and school information contained in the loan application was false. (*Id.* ¶¶ 30-32, 36.)

The Loan Center submitted Plaintiffs' loan application to EquiCredit as part of the underwriting process. (2nd. Am. Compl. ¶ 56.) Along with the loan application, The Loan Center submitted what Plaintiffs allege are false documents including 1997 and 1998 W-2 forms, two pay stubs, a completed Request for Verification of Employment form signed by the purported service manager of Elizabeth's stated employer (i.e., M & M Cleaning), and a typed, but unsigned loan application showing Elizabeth's purported base pay for 1998, all of which corroborated the false income and employment information in Plaintiffs' loan application.[1] (*Id.* ¶¶ 37, 56; Exs. C, D, E, F & G.) Plaintiffs allege that all of the defendants knew, or reasonably should have known, that this information was untruthful and inaccurate and that the loan would not have been approved based on Plaintiffs' actual earnings. (*Id.* ¶ 39.) Plaintiffs thus contend that they would not have qualified for the loan, but for The Loan Center's misconduct in fabricating qualifications and creating income that did not exist and but for EquiCredit's purposeful overlooking of those qualifications and relying

---

[1] Plaintiffs allege that The Loan Center submitted the following false documents: (1) a W-2 form from 1997 that purported to establish that Elizabeth earned $45,000.00 in wages from M & M Cleaning (Ex. C); (2) a W-2 form from 1998 that purported to establish that Elizabeth earned $49,500.00 in wages from M & M Cleaning (Ex. C); (3) a pay stub from M & M Cleaning for the pay period April 10-16, 1999 that purported to establish that Elizabeth earned a gross weekly salary of $1,031.25 and had earned a gross salary of $15,468.75 for the year to date (Ex. D); (4) a pay stub from M & M Cleaning for the pay period April 17-23, 1999 that purported to establish that Elizabeth earned a gross weekly salary of $1,031.25 and had earned a gross salary of $16,500.00 for the year to date (Ex. E); (5) a completed Request for Verification of Employment form signed by the purported service manager of M & M Cleaning dated April 30, 1999 allegedly showing that Elizabeth had a base pay of $40,000.00 for 1996 and $45,000.00 for 1997. The form also indicated that she had earned $17,531.00 through April 30, 1999 which meant that she would earn more than $53,000.00 during 1999 and falsely reported that Elizabeth had started her position with M & M Cleaning in February 1994. (Ex. F); and (6) a typed, but unsigned loan application showing that Elizabeth's purported base salary for 1998 was $4,125.00 per month or $49,500.00 per year (Ex. G). (2nd. Am. Compl. ¶ 37.)

4

solely on the fact that Plaintiffs' home was worth more than the amount loaned. (*Id.* ¶¶ 39, 56.)

Plaintiffs did not have any direct contact with EquiCredit during the loan closing and EquiCredit ultimately approved the loan. (2nd. Am. Compl. ¶ 56.) Plaintiffs allege that EquiCredit deliberately failed to independently verify Elizabeth's alleged employment information. (*Id.* ¶ 57.) For instance, EquiCredit should have known that Elizabeth could not be receiving Social Security disability benefits while simultaneously earning the amount of wages reported on her loan application. (*Id.*) In addition, Plaintiffs contend that EquiCredit relied on a credit report concerning Elizabeth that it knew was either false or incomplete because it showed that she had an "A" credit score of 645 and was employed at Breyer Molding (her employer when she purchased her home in 1984). (*Id.* ¶ 58.) Moreover, the credit report failed to substantiate that Elizabeth was currently employed at M & M Cleaning and failed to reveal that she was delinquent on her then existing mortgage with Security National Bank. (*Id.*)

On May 27, 1999, Moore and a representative of the title company went to Plaintiffs' home for the closing, at which time Plaintiffs and The Loan Center entered into a loan and a mortgage secured by Plaintiffs' property. (2nd. Am. Compl. Exs L, M & O.) At the closing, the defendants presented them with various papers to sign. (*Id.* ¶ 62.) Plaintiffs, who had limited educations, aver that they were unsophisticated borrowers who had difficulty reading and understanding such complex financial documents. (*Id.* ¶ 63.) Plaintiffs thus allege that the defendants took advantage of their limited educations. (*Id.* ¶ 64.)

At the closing, Plaintiffs received a HUD-1 settlement statement which they signed. (2nd. Am. Compl. ¶ 65; Ex. L.) The settlement proceeds were disbursed on or about June 2, 1999, at which time The Loan Center received its broker's fee in the amount of $6,350.00, the amount shown

on the HUD-1 settlement statement. (*Id.* ¶ 76; Ex. L.) Plaintiffs allege, however, that as part of defendants' scheme to defraud Plaintiffs, The Loan Center and EquiCredit manipulated the broker's fee by adjusting it from its initial amount of $9,520.00 (shown earlier on the Loan Brokerage Agreement) to $6,664.00 to $6,350.00 so that EquiCredit could avoid providing Plaintiffs with federally-required Home Owners Equity Protection Act ("HOEPA") loan disclosures. 12 U.S.C. § 1639. (*Id.* ¶¶ 48- 50, Exs. A, L, P, Q.) Plaintiffs thus contend that defendants falsely portrayed the broker's fee so that the combination of points and fees fell just below 8 percent (i.e., 7.97 percent) of the total loan in order to eliminate the additional disclosures required for "high rate" loans, which are triggered when points and fees exceed 8 percent of the total loan amount.[2] (*Id.* ¶ 50.) If just another $25.00 was added to the fees and points, then the total percentage would have exceeded the 8 percent. (*Id.* ¶ 60.) Plaintiffs further allege that The Loan Center never discussed or explained the reason for its substantial reduction in its broker's fee. (*Id.* ¶ 51.)

Plaintiffs allege that, in reality, in addition to The Loan Center's $6,350.00 broker's fee, The Loan Center also took an additional fee or kickback from the $10,500.00 paid to D&E Services from the closing proceeds. (2nd. Am. Compl. ¶ 52.) Plaintiffs contend that D&E Services was neither a creditor nor did it perform any services for or on behalf of Plaintiffs in connection with the subject loan transaction (e.g., real estate settlement services) even though the HUD-1 settlement statement indicated that Plaintiffs were responsible for the $10,500.00 payment to D&E Services. (*Id.* ¶¶ 53, 69.) Moreover, Plaintiffs aver that they had no knowledge of the existence of D&E Services until the closing and that the defendants never provided an explanation as to the nature of D&E Services

---

[2]Defendants did provide Plaintiffs with federal Truth-In-Lending disclosures relevant to other loan provisions. (2nd. Am. Compl. ¶ 72, Ex. K.)

and why it was entitled to a $10,500.00 payment from the closing proceeds. (*Id.* ¶ 54.) While Moore alleges that the payment to D&E Services was a deposit in connection with the payment of an undetermined amount of past due real estate taxes, Plaintiffs assert that the payment was actually a false or disguised broker's fee designed to disguise the amount of The Loan Center's broker's fee. (*Id.* ¶¶ 55, 79.) Plaintiffs thus contend that EquiCredit knew about the disguised broker's fee or kickback from D&E Services to The Loan Center, but did not disclose it to Plaintiffs.[3] (*Id.* ¶ 52.) EquiCredit, however, contends that D&E Services was, in fact, represented as a third-party creditor of Plaintiffs. (Defs.' Mem. at 5; 2nd Am. Complt., Ex. L & M.)

Plaintiffs further allege that they did not receive the full $10,000.00 in cash promised by Moore and The Loan Center at the closing. (2nd. Am. Compl. ¶ 66.) As indicated by the HUD-1 settlement statement, Plaintiffs received only $6,425.48 in cash. (*Id.*; Ex. L.) Moreover, according to Plaintiffs, the HUD-1 settlement statement indicated that a payment of $2,484.00 was made to the City of Chicago's Water Department; however, the Water Department received a payment of only $1,129.72. (*Id.* ¶ 67; Exs. L & M.) Plaintiffs further aver that while the HUD-1 settlement statement indicated that Security National Servicing Corporation should receive $34,589.26 as the payoff for Plaintiffs' existing mortgage, Security National Servicing Corporation notified The Loan Center three days prior to the closing and indicated that it would accept $31,000.00 as the full payoff amount (if the funds were received by May 28, 1999). (*Id.* ¶ 68; Exs. L & N.)

Plaintiffs also contend that Hunter failed to perform all of the repair work on their home and his work was very shoddy, substandard, grossly defective and unsatisfactory on a majority of the

---

[3]Plaintiffs contend that Hunter also received some of the payment made to D&E Services as a referral fee or kickback for referring Plaintiffs to The Loan Center. (2nd. Am. Compl. ¶¶ 46-47.)

items that he did complete. (2nd. Am. Compl. ¶ 80.) While Hunter guaranteed workmanship for one year, he never returned to Plaintiffs' home to complete the work.[4] (*Id.* ¶¶ 81-82.) Nevertheless, according to Plaintiffs, EquiCredit approved the work Hunter performed and distributed the remaining $16,000.00 that had been held in reserve to Hunter. (*Id.* ¶ 83.) Plaintiffs thus aver that EquiCredit released the funds to Hunter because he had referred Plaintiffs to The Loan Center and not because he had satisfactorily completed the repair work he had agreed to undertake. (*Id.*)

On May 28, 2002, three years after the closing, Plaintiffs served a notice of rescission on EquiCredit rescinding the loan transaction. (2nd. Am. Compl. Ex. O.) The notice named Truth in Lending Act (hereinafter "TILA") violations as the basis for the rescission and instructed EquiCredit to return Plaintiffs' money and to terminate its security interest in Plaintiffs' property. (*Id.*) To date, EquiCredit has not returned any money or terminated its security interest in Plaintiffs' property. (*Id.* ¶ 142c.)

## LEGAL STANDARD

The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the complaint, and not to decide its merits. *Gibson v. Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Courts read complaints liberally and a motion to dismiss will be granted only, "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing a motion to

---

[4]The City of Chicago instituted administrative legal proceedings against Plaintiffs based on various building violations actually caused or resulting from the work Hunter improperly performed and/or failed to correct. (2nd. Am. Compl. ¶¶ 100-101, 104.) Plaintiffs were fined $1,450.00 for the building violations. (*Id.* ¶ 105.)

The City of Chicago also instituted administrative legal proceedings against Hunter based on his failure to provide the contracted services to Plaintiffs. (*Id.* ¶ 103.) Hunter defaulted and an administrative judgment of $32,000.00 was entered against him. (*Id.*)

dismiss, the district court must treat all well-pleaded allegations as being true and draw all reasonable inferences in the light most favorable to the plaintiff. *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999), *cert denied* 120 S.Ct. 2691 (2000). [T]he issue is not whether the plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence that supports the claims." *Scheurer v. Thodes*, 416 U.S. 232, 236, 94 S.Ct.1683, 40 L.Ed.2d 90 (1974).

At the same time, a plaintiff must include in the complaint allegations concerning all material elements necessary for recovery under the relevant legal theory. *Chawla v. Klapper*, 743 F.Supp. 1284, 1285 (N.D. Ill. 1990). This requirement, however, must be considered in light of the federal system of notice pleading, which merely requires that a plaintiff set out in the complaint a short and plain statement of the claim that provides the defendant with fair notice of what the claim is and the grounds upon which it rests. *McCormick v. City of Chicago,* 230 F.3d 319, 323-26 (7th Cir. 2000); *Scott v. City of Chicago*, 195 F.3d 950, 951 (7th Cir. 1999). For fair notice to be given, "a complaint must at least 'include the operative facts upon which a plaintiff bases his claim.'" *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992) (*quoting Rogers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 198 (7th Cir. 1985)). The issue the court reviews is whether "sufficient facts [have been] pleaded to allow the district court to understand the gravamen of the plaintiff's complaint." *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996); *Kyle v. Morton High Sch.*, 144 F.3d 448, 454-55 (7th Cir. 1998); *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998).

## ANALYSIS

## I.     PLAINTIFFS HAVE PLED VALID FEDERAL TRUTH IN LENDING ACT CLAIMS.

In Counts IV and V of the Second Amended Complaint, Plaintiffs assert five violations of the Truth In Lending Act (hereinafter "TILA"). 15 U.S.C. § 1601 *et seq.* Thus, by their nature, and

as a threshold matter, Plaintiffs' must first establish that their mortgage loan transaction meets the definition of a "high rate" transaction set forth in 15 U.S.C. § 1602(aa) and therefore is subject to the provisions of HOEPA.

In order for a loan to qualify as a mortgage loan within the definition of 15 U.S.C. § 1602(aa) (i.e., HOEPA loan), a mortgage loan must satisfy five requirements.[5] *Lopez v. Delta Funding Corp.*, No. CV 98-7204 CPS, 1998 WL 1537755, at *5 (E.D.N.Y. Dec. 23, 1998). The parties agree that the first four requirements have been satisfied, but dispute the fifth requirement which is at issue in this motion. The fifth requirement establishes two circumstances under which a "high rate" loan will be triggered under HOEPA. Specifically, Section 1602(aa)(1) provides that a mortgage is a "high rate" mortgage if:

> (A)   the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

> (B)   the total points and fees *payable* by the consumer *at or before closing* will exceed the greater of –

> (i)    8 percent of the total loan amount; or
> (ii)   $400.  (emphasis added).

Therefore, if a mortgage loan satisfies all five requirements, it is considered a HOEPA loan under

---

[5]For purposes of EquiCredit's motion to dismiss, the first four requirements are not at issue. Those requirements are: (1) the mortgage loan must be a "consumer credit transaction," as defined in 15 U.S.C. § 1602(h); (2) the mortgage loan must be a consumer credit transaction with a "creditor," as defined in 15 U.S.C. § 1602(f); (3) the mortgage loan must be secured by the "consumer's principal dwelling," as defined with reference to the definition of "dwelling" in 15 U.S.C. § 1602(v); and (4) the mortgage loan must be a second or subordinate residential mortgage, not a "residential mortgage transaction," a "reverse mortgage transaction," or a transaction under an "open credit plan." *Lopez*, 1998 WL 1537755, at *5.

15 U.S.C. § 1602(aa) and is subject to the disclosure requirements of HOEPA, 15 U.S.C. § 1639 and TILA, 15 U.S.C. § 1601 *et seq.*

Plaintiffs herein have alleged that Section 1602(aa)(1)(B) was satisfied by EquiCredit's mortgage loan transaction because the payment made to D&E Services was a disguised broker's fee which would have resulted in the total fees and points exceeding 8 percent of the total loan amount. (Pl.'s Mem. at 11; 2nd. Am. Compl. ¶¶ 52, 55, 60.) Plaintiffs thus aver that EquiCredit carefully and misleadingly structured and manipulated the loan components so that the combination of points and fees was less than 8 percent (i.e., 7.97 percent) in order to avoid making the additional required disclosures. (*Id.* ¶ 61.) Therefore, accordingly to Plaintiffs' complaint, EquiCredit knew that D&E Services intended to pay a kickback to The Loan Center (and perhaps others) in connection with the obtaining of the loan and falsely portrayed the broker's compensation so that the loan was not subject to HOEPA requirements. (*Id.* ¶ 48.)

EquiCredit, on the other hand, avers that points and fees do not include all compensation paid to mortgage brokers by any person at any time. (Def.'s Reply at 3.) Thus, in order to trigger the HOEPA disclosure requirements, the statute provides that payments to the mortgage broker must be made by the consumer "at or before closing." 15 U.S.C. § 1602(aa)(1)(B). EquiCredit asserts that, according to Plaintiffs' complaint, the payment from D&E Services to The Loan Center was made sometime *after* closing, not "at or before" closing. Therefore, as a matter of law, EquiCredit contends that because the purported kickback was made after closing, it does not qualify as points and fees under TILA.

The Court finds that EquiCredit's contention that there is no statutory violation because the alleged disguised broker's fee or kickback from D&E Services to The Loan Center does not qualify

11

as points and fees because it was not made "at or before closing" to be unavailing. 15 U.S.C. § 1602(aa)(1)(B). In this regard, EquiCredit, respectfully, has omitted pertinent statutory language. The applicable clause at issue does not require "payment" at or before closing. Rather, the subject clause expressly provides that a mortgage that is subject to HOEPA requirements is one where "the total points and fees *payable* by the consumer *at or before closing*" exceed 8 percent of the total loan amount. (emphasis added). 15 U.S.C. § 1602(aa)(1)(B)(I). Moreover, upon complete review of the Second Amended Complaint allegations, and drawing all reasonable inferences from the well-pleaded allegations in favor of the Plaintiffs (e.g., *id.* at ¶¶ 48-52, 60, 61), the Court finds that Plaintiffs have alleged (particularly considering notice pleading requirements) that (A) EquiCredit knew "at or before closing" that an additional disguised broker's fee was "payable" to The Loan Center; and (B) EquiCredit knew at or before closing that the points and fees payable to the Plaintiffs consumers exceeded 8 percent, thus triggering the HOEPA disclosure requirements here at issue.[6] 15 U.S.C. § 1639.

Accordingly, the Court finds that Plaintiffs have properly pled Counts IV and V. *See e.g., Conley*, 355 U.S. at 45, 78 S.Ct. 99, 2 L.Ed.2d 80; *DeLeon,* 55 F.Supp.2d at 825.

## II. PLAINTIFFS STATE LAW CLAIMS FOR CONSUMER FRAUD, COMMON LAW FRAUD AND NEGLIGENT MISREPRESENTATION HAVE BEEN ADEQUATELY

---

[6]In this regard, the Court also finds to be unavailing, EquiCredit's assertion, pursuant to the Official Staff Commentary, that in order to qualify as points and fees, that EquiCredit would have had to deliver the funds directly to The Loan Center. The Official Staff Commentary states that compensation paid to a mortgage broker qualifies as points and fees only if it is paid "by a consumer to a mortgage broker (directly or though the creditor for delivery to the broker) . . . " 12 C.F.R. Pt. 226, Supp. I, Par. 32(b)(1)(ii). As is pertinent here, by its terms, the Official Staff Commentary does not state that the creditor, EquiCredit, must have delivered the funds directly to The Loan Center. Rather, if, as averred here, the alleged disguised broker's fee or kickback was paid to The Loan Center "through" EquiCredit (the creditor), via D&E Services, this could qualify as points and fees under the Staff Commentary cited.

**PLED.**

In their Second Amended Complaint, Plaintiffs assert state law claims for consumer fraud (Count III), common law fraud (Count VIII) and negligent misrepresentation (Count XII). These claims are based on the allegation that EquiCredit did not disclose the purported kickback that D&E Services paid to The Loan Center pursuant to TILA disclosure requirements. Thus, Plaintiffs assert that EquiCredit misrepresented the points and fees payable at or before closing by not disclosing the purported post-closing kickback from D&E Services to The Loan Center.

EquiCredit avers that Plaintiffs are barred from asserting these state law fraud and misrepresentation claims because it complied with TILA disclosure requirements.[7] (Def.'s Mem. at 12.)

As discussed *supra,* Plaintiffs have adequately alleged in their Second Amended Complaint that EquiCredit failed to comply with TILA disclosure requirements. Therefore, Plaintiffs state law fraud and misrepresentation claims (Counts III, VIII and XII) are not barred and stand as pled.[8]

## III. PLAINTIFFS STATE LAW CLAIMS FOR CONSUMER FRAUD, COMMON LAW FRAUD, FRUITS OF THE FRAUD, AND CONSPIRACY SATISFY THE PARTICULARITY REQUIREMENT OF RULE 9(b).

In their Second Amended Complaint, Plaintiffs assert state law claims for consumer fraud (Count III), common law fraud (Count VIII), fruits of the fraud (Count X), and conspiracy (Count XI). Plaintiffs fraud claims and conspiracy claims are predicated on EquiCredit's alleged knowledge

---

[7]Under Illinois law, it is well-established that where a lender has complied with TILA, the lender is immune from state law claims for fraud or misrepresentation arising from the same loan documents and associated disclosures. *Chandler v. Am. Gen. Fin., Inc.,* 329 Ill.App.3d 729, 742, 768 N.E.2d 60, 71, 263 Ill.Dec. 300 (2002).

[8]Plaintiffs have alleged the elements that meet a claim of deception under the Consumer Fraud Act. *Cripe v. Leiter,* 184 Ill.2d 185, 191, 703 N.E.2d 100, 103, 234 Ill.Dec. 488 (1998).

of the disguised broker's fee or kickback paid to The Loan Center by D&E Services. (2nd. Am. Compl. ¶ 52.)

EquiCredit avers that Plaintiffs fraud and conspiracy claims should be dismissed because they have not alleged intent or knowledge on the part of EquiCredit with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P.9(b). (Def.'s Mem. at 13.) Specifically, EquiCredit contends that Plaintiffs have not alleged any facts from which the Court can infer that it had actual knowledge of the purported kickback that D&E Services paid to The Loan Center. (Id.; Def.'s Reply at 9.) Thus, according to EquiCredit, Plaintiffs have not asserted that anyone told it about the purported kickback or that anyone provided it with any documents which indicated that there would be a kickback. (Def.'s Reply at 9.) Furthermore, EquiCredit contends that Plaintiffs' allegations that EquiCredit knew about the kickback because The Loan Center had reduced its broker's fee does not create an inference that EquiCredit knew the financial terms of the original Loan Brokerage Agreement between Plaintiffs and The Loan Center.[9] (Id.)

Rule 9(b) of the Federal Rules of Civil Procedure provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). However, "despite the specificity requirement, the federal courts remain a notice pleading system where 'a suit should not be dismissed so long as it is possible to hypothesize facts, consistent

---

[9]EquiCredit also asserts that Plaintiffs have failed to identify any purported false statement or omission on its part, other than its purported failure to disclose that D&E Services was going to pay The Loan Center a "kickback" after closing. (Def.'s Reply at 8.) Thus, EquiCredit contends that Plaintiffs cannot establish the first element of their common law fraud and statutory consumer fraud claims; namely, that EquiCredit made a false statement or material omission of material fact. See e.g., Connick v. Suzuki Motor Co., Ltd., 174 Ill.2d 482, 496-97, 675 N.E.2d 584, 591, 221 Ill.Dec. 389 (1996).

with the complaint, that would make out a claim for relief.'" *DeLeon v. Beneficial Constr. Co.,* 55 F.Supp.2d 819, 825 (N.D. Ill 1999) (citation omitted).

The Plaintiffs maintain that contrary to EquiCredit's characterization of Plaintiffs' claims, Plaintiffs' consumer fraud, common law fraud and conspiracy claims entail more than EquiCredit's involvement in and knowledge of the kickback of the disguised broker's fee payment to The Loan Center. Nevertheless, even just considering those disguised broker's fee (and kickback) allegations, the Court finds that Plaintiffs have plead particular facts that, along with the reasonable inferences drawn from those facts, set forth EquiCredit's requisite *scienter* with respect to the improper and deceptive payment.

For example, Plaintiffs first allege that they were initially told that The Loan Center's fee would be $9,520.00, but that this $9,250.00 fee was later adjusted (downward) by EquiCredit to avoid the additional disclosures that would have been required by law (because the points and fees would have then passed the requisite 8 percent level). (2nd. Am. Compl. ¶¶ 28b, 49.) After Plaintiffs above-related  discussion with The Loan Center, however, Plaintiffs did not again discuss the amount of the broker's fee or the loan amount with any defendant until closing, which Plaintiffs aver was done to permit EquiCredit to avoid providing the additional disclosures as to points and fees required by law. (*Id.* ¶¶ 49, 51.) Thus, according to Plaintiffs, the broker's fee amount was manipulated downward by The Loan Center and EquiCredit from the earlier $9,250.00 to $6,664.00 and then downward again to $6,350.00, at closing, in the absence of any discussion, notification or involvement with Plaintiffs. This conduct and downward manipulation was done for the purpose, as stated, of *inter alia* allowing EquiCredit to avoid the additional disclosures required by HOEPA. (*Id.* ¶¶ 49-52, 61.) In addition, given that the loan amount remained constant from the time that

Plaintiffs signed the Loan Brokerage Agreement with The Loan Center, there appears to be no

adequate business reason that would explain why The Loan Center would unilaterally agree to cut

its fee without there also being a concomitant reduction in the loan amount unless EquiCredit gained

something from it. (*Id.* ¶ 28a.) At a minimum, a reasonable inference is that that "something" may

have been the avoidance of HOEPA disclosures.[10] (*Id.* ¶ 61.)

The Court, therefore, finds that Plaintiffs have pled their fraud and conspiracy claims with

the particularity required by Rule 9(b). Accordingly, the motion to dismiss Plaintiffs' state law

claims for consumer fraud (Count III), common law fraud (Count VIII), fruits of the fraud (Count

X), and defendants' conspiracy (Count XI) are denied.

## IV.   PLAINTIFFS HAVE PLED A VALID STATE LAW CLAIM AGAINST EQUICREDIT FOR INDUCING A BREACH OF FIDUCIARY DUTY.

In Count VII of the Second Amended Complaint, Plaintiffs assert a cause of action against

EquiCredit for inducing The Loan Center to breach its fiduciary duty to Plaintiffs.

EquiCredit asserts that Plaintiffs seek to hold it responsible for D&E Services' alleged

payment of a kickback to The Loan Center on the theory that EquiCredit induced The Loan Center

to breach its fiduciary duty to Plaintiffs. (Def.'s Mem. at 14.) EquiCredit claims, however, that

because it had no involvement in the alleged kickback that D&E Services paid to The Loan Center,

a claim against it for inducement of any breach of fiduciary duty would be baseless. (*Id.* at 14-15.)

In addition, EquiCredit avers that even assuming that The Loan Center owed Plaintiffs any fiduciary

---

[10]Plaintiffs thus have also satisfied Rule 9(b) by adequately identifying the nature of the conspiracy, each defendant's role and the existence of an agreement among the conspirators to inflict the alleged wrong, with each profiting from their collective misconduct. *See e.g., Tango Music, L.L.C. v. Deadquick Music Inc.,* No. 99 C 7331, 2001 WL 897606, at *6 & n. 6 (N.D. Ill. Aug. 9, 2001); *Eisenhauer v. Stern,* No. 99 C 6422, 2000 WL 136011, at *2 (N.D. Ill. Jan. 27, 2000).

duty, Plaintiffs have failed to plead the requisite elements of a claim for inducing a breach of fiduciary duty. (*Id.* at 14.) *See e.g., Jones v. Sabis Educational Systems, Inc.*, No. 98 C 4252, 1999 WL 1206945, at *4 (N.D. Ill. Dec. 13, 1999).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff set forth "a short and plain statement" of the claim(s) upon which he is entitled to relief. Fed.R.Civ.P.8; *McCormick*, 230 F.3d at 323-26; *Scott*, 195 F.3d at 951. Rule 8 does not require that a plaintiff plead facts matching every element of a legal theory. *Watson v. CBSK Financial Group*, 197 F.Supp.2d 1118, 1125 (N.D. Ill. 2002). Rather, the complaint must merely put a defendant on fair "notice" as to the nature of the claim(s). (*Id.*)

In its Second Amended Complaint, Plaintiffs have alleged that EquiCredit knowingly participated in or induced the breach of fiduciary duty: that is, EquiCredit, as discussed *supra*, "paid The Loan Center and others amounts that were nothing but referral fees and kickbacks" and "[t]he excess compensation bought off The Loan Center and induced it to breach its fiduciary duties." (2nd. Am. Compl. ¶¶ 177-78.) Plaintiffs have further averred that the induced breach of the mortgage broker's fiduciary duty affected the loan transaction itself, not just the payment of the disguised broker's fee, in that, The Loan Center, the fiduciary, knowingly accepted the benefits from the breach of the fiduciary duty when it made a loan to Plaintiffs that was not competitively priced and charged higher interest rates, excessive charges and higher monthly payments.[11] (*Id.* ¶¶ 172, 179.)

---

[11]In its Reply, EquiCredit claims, citing certain paragraphs of the Second Amended Complaint, that Plaintiffs have pled themselves out of court on this Count VII. (Def.'s Reply at 13.) Upon review, the Court, respectfully, disagrees. (*See e.g.* discussion *supra*, this section, as well as section III.)

Therefore, the Court finds that pursuant to federal notice pleading standards, Plaintiffs have properly pled its claim that EquiCredit induced The Loan Center to breach its fiduciary duty to Plaintiffs.

## V.  PLAINTIFFS HAVE NOT PLED A VALID STATE LAW CLAIM FOR RESTITUTION AND UNJUST ENRICHMENT.

In Count XIII of the Second Amended Complaint, Plaintiffs purport to state a cause of action for restitution/unjust enrichment. Plaintiffs aver that they have properly pled a claim for restitution/unjust enrichment because regardless of the falsified information they submitted as part of the loan application, EquiCredit improperly made the loan based on the value of the home and property, and not on Plaintiffs ability to repay. (Pl.'s Mem. at 20; 2nd. Am. Compl. ¶ 56.) Plaintiffs thus allege that despite EquiCredit's defense asserting the doctrine of unclean hands, they are not subject to the unclean hands defense with respect to the loan approval process herein because they did not do anything that EquiCredit relied on.[12]  (Pl.'s Mem. at 20.)

As pled by Plaintiffs, Elizabeth decided to state in her application *inter alia* that she had been working at M & M Cleaning Services since 1997 and that her income from the job was $1,800.00 per month. (2nd. Am. Compl. ¶¶ 29-31, 36, Ex. B.) Plaintiffs elected to allege that all of those facts were untrue. (*Id.* ¶¶ 30-31, 37-39.) Elizabeth also represented in the loan application that she and her mother, Louise (the co-plaintiff), had graduated from high school, and Plaintiffs chose to allege that that was false, too. (*Id.* ¶ 32.) Plaintiffs nonetheless signed the loan application and certified

---

[12]Although unclean hands is an affirmative defense, the Court may consider affirmative defenses on a motion to dismiss if, as herein, the facts giving rise to the defense are apparent on the face of the complaint. *See e.g., Perminas v. Novartis Seeds, Inc.,* No. 00 C 4581, 2000 WL 1780249, at *2 (N.D. Ill. Dec. 4, 2000)(*citing Berco Investments, Inc. v. Earle M. Jorgensen Co.,* No. 94 C 3961, 1996 WL 388463, at *3 (N.D. Ill. July 8, 1996)("Where an affirmative defense or other bar to relief is apparent from the face of the complaint, dismissal is proper.")

under penalties of law that the information contained therein was correct. (*Id.* ¶ 32, Ex. B at 3.) The Loan Center, whom Plaintiffs allege were their agent, submitted the false loan application to EquiCredit. (*Id.* ¶¶ 56, 156.) The Loan Center, on behalf of Plaintiffs, also submitted to EquiCredit what Plaintiffs concede are "false documents," including 1997 and 1998 W-2 forms, two pay stubs, a completed Request for Verification of Employment form signed by the purported manager of Elizabeth's stated employer, and a typed loan application, all of which corroborated the income and employment information in Plaintiffs' untruthful loan application. (*Id.* ¶¶ 37, 56, Exs. C-G.)

"Restitution is an equitable remedy." *Pawlikowski v. Toyota Motor Credit Corp.,* 309 Ill.App.3d 550, 565, 722 N.E.2d 767, 778, 243 Ill.Dec. 1 (2nd Dist. 1999). It is blackletter law that one who comes into equity must come with clean hands and is not entitled to an equitable remedy that would reward illegal activity. *See e.g., Scheiber v. Dolby Laboratories, Inc.,* 293 F.3d 1014, 1021 (7th Cir. 2002). "Under Illinois law, misconduct on the part of a plaintiff which will defeat a recovery in a court of equity under the doctrine of 'unclean hands' must have been conduct in connection with the very transaction being considered or complained of, and must have been misconduct, fraud or bad faith toward the defendant making the contention." *Baal v. McDonald's Corp.,* 97 Ill.App.3d 495, 500-01, 422 N.E.2d 1166, 1171, 52 Ill.Dec. 957 (1981); *see also Energetec Sys., Inc. v. Kayser,* No. 84 C 10611, 1986 WL 8058, at *2 (N.D. Ill. July 17, 1986) ("The defense of unclean hands is shown by misconduct by the plaintiff involving the transaction complained of, which amounts to fraud, misconduct or bad faith toward the defendant making the contention.")

Inherently, reliance is not an element of the unclean hands defense. *See e.g., Baal,* 97 Ill.App.3d at 500-01, 422 N.E.2d at 1171, 52 Ill.Dec. 957; *see also Energetec Sys., Inc.,* 1986 WL 8058, at *2. Accordingly, Plaintiffs' cannot sustain their Count XIII claim based on their allegations

that EquiCredit did not rely on Plaintiffs' misrepresentations during the loan approval process. Consequently, the Court dismisses Count XIII of Plaintiffs' Second Amended Complaint.

## CONCLUSION

In view of the foregoing, Defendant EquiCredit's Motion to Dismiss Plaintiffs' Second Amended Complaint is granted as to Count XIII and denied as to all other counts.

ENTER:

IAN H. LEVIN
**United States Magistrate Judge**

**Dated: April 10, 2003**